UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:13-CV-01046-TBR

STEVEN MACKENZIE, *et al*.                                               Plaintiffs

v.

JLG INDUSTRIES, INC., *et al*.                                            Defendants

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendant JLG Industries, Inc.'s Motion to Exclude Expert Testimony of John Jendrzejewski and Mark Webster.  (Docket #51). Plaintiff has responded.  (Docket #61).  These matters now are ripe for adjudication. For the foregoing reasons, Defendant's motion (Docket #51) is DENIED.

BACKGROUND

This action arises from Plaintiff Steven Mackenzie's fall from a vertical lift manufactured by Defendant JLG Industries, Inc. ("JLG").  Mackenzie was working for Axxis, Inc. ("Axxis") as Axxis dismantled the Kalightascope holiday tent at the Galt House Hotel in Louisville, Kentucky.  The Kalightascope tent is a large tent with stage decking for the floor and black liners along the walls.  Mackenzie and three Axxis employees were having trouble removing the liners because they were binding at the apex of the tent. (Docket #62).  To ease the process, Mackenzie ascended a JLG 30AM Vertical Lift (the "Lift") to spray lubricant into the apex of the tent.  (Docket #52). While the Lift was raised, it began to sway and then fell.  Mackenzie fell approximately thirty feet, suffering injuries to his back, ribs, and legs.  (Docket #62).

Page 1 of 16

The Lift has four wheels and four outriggers. The outriggers extend diagonally from each corner of the Lift. The outrigger legs are first secured by removing a safety pin and pushing the leg into a locked position. The outrigger legs are then lowered by turning a jack screw until a footpad contacts the floor. (Docket #52). After the fallen Lift was inspected, it was discovered that one of the jack screws had broken near its base. (Docket #62). Each party has offered expert witnesses to explain why and how the jack screw fractured.

JLG asserts the jack screw broke under the stress of the Lift tilting and falling, but did not cause the fall. In support, JLG offers an expert who opines the jack screw broke because as the Lift fell it subjected the jack screw to excessive bending stress. (Docket #51, Ex. 7). JLG's metallurgy expert opines that the surface of the fractured jack screw is "consistent with a single-overload failure." (Docket #51).

Mackenzie asserts that the jack screw broke because it was worn. Mackenzie offers as support the expert opinion of John Jendrzejeski, who opines that the outrigger design caused metal on metal friction. (Docket #62). This friction caused wear and reduced the diameter of the jack screw by approximately half. Mackenzie also offers as support the expert opinion of Mark Webster, who opines that as the jack screw thinned, it changed the angle at which the jack screw and the footpad joined. This increasingly severe angle caused mounting stress on a thinning jackscrew, ultimately fracturing the jack screw at the thinnest point. (Docket #62). Jendrzejeski also opines the surface of the fractured jack screw showed three to four "curved bands" which are evidence the Lift swayed back and forth before the jack screw ultimately fractured. (Docket #61, Ex. 8).

JLG moves to exclude the expert testimony of both Jendrzejeski and Webster. (Docket #52). JLG argues both experts are unqualified to offer testimony and that both experts' opinions are unreliable.

STANDARD FOR EXPERT TESTIMONY

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

A trial court plays a "gatekeeper" role, excluding evidence that is "unreliable and irrelevant." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002). The inquiry is "a flexible one" and the focus "must be solely on [proposed expert's] principles and methodology, not on the conclusions they generate." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 594-95 (1993). While there is no "definitive checklist or test," some factors to consider include: (i) whether the theory or technique "can be (and has been) tested," (ii) whether it "has been subjected to peer review and publication," (iii) whether it has a "known or potential rate of error," and (iv) whether the theory or technique enjoys general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 594 (1993). In general, a testifying expert is expected to "employ[] in the

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The Sixth Circuit has outlined "[r]ed flags that caution against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). These include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Id.* (citing *Best*, 563 F.3d at 177). Also, testimony prepared solely for litigation "should be viewed with some caution." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007)).

"*Daubert* attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009). However, the "trial judge is not the court's armed guard," and the "rejection of expert testimony under *Daubert* is the exception rather than the rule." *Daugherty v. Chubb Group of Ins. Cos.*, 2011 U.S. Dist. LEXIS 131679 *6 (W.D. Ky. 2011) (citations and punctuation omitted). If the expert testimony is shown to be reliable by a "preponderance of the evidence," then the testimony should be admitted and "tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Id.* (*quoting Ruiz-Troche v. Pepsi Cola of P.R.*, 161 F.3d 77, 86 (1st Cir. 1998)); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction

on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

A trial judge has "considerable leeway" in deciding whether expert testimony is reliable and his decision is reviewed for abuse of discretion. *Kumho*, 526 U.S. at 152; *Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 672 (6th Cir. 2010) ("where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line").

## DISCUSSION

JLG Industries has moved to exclude the expert testimony of two of Plaintiff's experts. The Court will first discuss (I) the qualifications of each expert witness; then (II) the reliability of each expert witness's testimony.

### I. Qualification as an Expert.

An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The focus must remain on whether the expert's "qualifications provide a foundation for a witness to answer a specific question," not whether the expert is qualified in the abstract." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Thus, an expert may be qualified in one subject, but his testimony excluded if he strays too far afield. *Burgett v. Troy-Bilt LLC*, 2013 U.S. Dist. LEXIS 96893 (E.D. Ky. 2013) (holding a mechanical engineer was unqualified to testify on electrical systems or biomechanical issues, as he lacked education or experience in those areas). Conversely, if the expert "lack[s] familiarity with some aspects" of the issue on which he opines, "such unfamiliarity merely affect[s] the weight and credibility

of his testimony, not its admissibility." *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001).

The Court will first discuss (A) Mark Webster's qualifications; then discuss (B) John Jendrzejewski's qualifications.

### A. Mark Webster is qualified to offer his expert opinion.

Webster opines that the outrigger design was faulty because it allowed for severe wear which weakened the outrigger and resulted in the outrigger failing. Webster also opines that viable alternative designs were available which would have avoided this problem. (Docket #61, Ex. 5).

Webster earned both a bachelor's and master's degree in mechanical engineering. (Docket #61, Ex. 1). He has worked for twenty-nine years and is currently Vice President of Engineering for Pflow Industries, Inc., which Plaintiff describes as "a leading supplier of vertical lifts and lifting systems." (Docket #61). Webster has designed, tested, and inspected lifts as part of his employment with Pflow. *Id*. (Docket #61, Ex. 1). Webster is a member of multiple engineering organizations, has published an article related to lifts, and holds nine patents, several of which are related to lifts. *Id*. Webster has also served as the "Vice Chair of an ASME/ANSI Safety Standard Committee and was a member of the ASME Board of Safety Codes and Standards, overseeing all ASME/ANSI safety standards." (Docket #61). Finally, Webster has been qualified as an expert witness on vertical lifts in several previous cases. (Docket #61, Ex. 4).

JLG argues that, despite these credentials, Webster is unqualified because he has no experience with ANSI A92.3, the industry standard applicable to the Lift in this case.

(Docket #51). JLG also argues Webster has not inspected or tested the specific model of Lift in this case and is not trained to operate a vertical mast lift. *Id*.

JLG's efforts to distinguish Webster's expertise from his opinions are unpersuasive. Webster has advanced degrees in mechanical engineering, an almost-thirty-year career designing and testing vertical lifts, and has served on committees responsible for the safety standards at issue in this case. While he has not designed a vertical lift that "fits specifically into the category covered by the A92.3 standard," (Docket #61, Ex. 2), JLG has not explained what is unique about this particular standard that would render Webster's expertise irrelevant. To the extent Webster has not worked on the specific Lift at issue in this case, those concerns go to the weight and credibility of his testimony, but are not grounds to exclude his testimony. *Piskura v. Taser Int'l, Inc.*, 2013 U.S. Dist. LEXIS 107611 *27 (S.D. Ohio, 2013) ("assertions that a witness lacks particular experience, generally go to the weight, not the admissibility, of testimony").

### B. John Jendrzejewski is qualified to offer his expert opinion.

Jendrzejewski opines the jackscrew was worn from contact with a hardened steel washer during periods when the screw was being turned to raise or lower the outrigger leg. Jendrzejewski further opines that the fractured surface of the jackscrew showed three to four bands of "microscopic dull features," that these bands show the jack screw bent three to four times before fracturing, consistent with the claim that the platform swayed before toppling. (Docket #61, Ex. 7, 8).

Jendrzejewski earned a bachelor's degree in earth science and both a master's degree and doctorate in geology. (Docket #61, Ex. 6). Since 1975, he has held high

positions at several different laboratory corporations where his duties included metallurgical and other solid materials failure analysis. *Id*. Most recently he was the Chief Metallurgist/Failure Analyst at IMR Metallurgical Services Louisville for ten years and in 2011 began working as the Senior Consultant/Failure Analyst at Applied Technical Services, Inc. He lists seventeen technical presentations to various conferences and five past affiliations with metallurgical or failure analysis organizations. *Id*. Plaintiff describes Jendrzejewski's forty-year career as "70% of his project work involved metallurgical analyses involving varying components" in several industries and "30% of Dr. Jendrzejewski's project work is involved in litigation related activities for attorneys and insurance companies." (Docket #61). Finally, Jendrzejewski has previously been found qualified to testify as an expert witness, including by this Court in a case where Jendrzejewski testified regarding the metallurgical construction of a lift on behalf of the defendants. *See Faughn v. Upright, Inc.*, 2007 U.S. Dist. LEXIS 19341 *4 (W.D. Ky. 2007).

JLG argues Jendrzejewski is not qualified because "**Jendrzejewski admitted that he is not a metallurgical engineer**" and because he does not have a degree in metallurgy. (emphasis in original) (Docket #51). First, while Jendrzejewski admitted he is not a metallurgical engineer, he does contend he is a metallurgist. (Docket #61, Ex. 7). Therefore, the cases JLG relies upon in which purported experts admitted they were not metallurgists are inapplicable. Moreover, those cases are distinguishable because the purported experts had little to no experience in metallurgy. *See Potts v. Martin & Bayley, Inc.*, 2011 U.S. Dist. LEXIS 114588, *5 (W.D. Ky. 2011); *Brown v. Teledyne Cont'l Motors, Inc.*, 2007 U.S. Dist. LEXIS 18179, *6-7 (N.D. Oh. 2007);

*H.C. Smith Invs., LLC v. Outboard Marine Corp.*, 181 F. Supp. 2d 746, 752 (S.D. Mich. 2002). Jendrzejewski's qualifications should not be questioned merely because he showed the caution to refrain from calling himself a metallurgical engineer and instead specified that he is a metallurgist.

JLG also argues that Jendrzejewski is unqualified because he does not have a degree in metallurgy, but rather his degrees are in earth sciences and geology. (Docket #51). JLG argues that an expert "must have an educational background in metallurgy" to testify on this subject. (Docket #51). In support, JLG cites cases in which an expert with a degree in metallurgy was found qualified, and compares them to cases in which a purported expert without a degree in metallurgy was unqualified. *See Briley v. U.S. United Barge Line, LLC*, 2012 U.S. Dist. LEXIS 85377 (W.D. Ky. 2012); *Hogue v. Permanent Mold Die Co.*, 177 F. Supp. 229, 231-32 (E.D. Mich. 1959); *Potts*, 2011 U.S. Dist. LEXIS 114588. While these cases show that a degree in metallurgy is significant in being found qualified, none of these cases state a degree is required. Moreover, such an educational requirement would violate the rule that an expert may be qualified on experience alone. *United States v. Revels*, 2012 U.S. Dist. LEXIS 65069 *12-13 (E.D. Tenn. 2012); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2nd Cir. 1995).

This Court has previously addressed these arguments in an unrelated case and found "Dr. Jendrzejewski's extensive experience in the area of metallurgical material failure analysis qualifies him to give expert testimony in this matter, regardless of the title on his degree." *Faughn v. Upright, Inc.*, 2007 U.S. Dist. LEXIS 19341 *4 (W.D.

Ky. 2007). Again, the Court finds Jendrzejewski's extensive experience in metallurgical failure analysis qualifies him to offer his expert opinion in this case.

## II. Reliability of Expert Testimony

Turning to the second half of this analysis, the Court will now address the reliability of each expert's testimony. While there is no "definitive checklist or test" for what constitutes reliable testimony, some factors to consider include: (i) whether the theory or technique "can be (and has been) tested," (ii) whether it "has been subjected to peer review and publication," (iii) whether it has a "known or potential rate of error," and (iv) whether the theory or technique enjoys general acceptance in the relevant scientific community. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 594 (1993). The Supreme Court also made clear that "in the engineering context especially, the factors listed above do not constitute a 'definitive checklist or test.'" *Manitowoc Boom Trucks,* 484 F.3d at 430-31.

The Court will first discuss (A) the reliability of Mark Webster's expert testimony; then discuss (B) the reliability of John Jendrzejewski's expert testimony.

### A. Mark Webster's expert opinions are reliable.

Webster generally offered two opinions: (i) the outrigger design was faulty because it allowed for severe wear which weakened the outrigger; and (ii) there were viable alternative designs which would have avoided this problem. (Docket #61, Ex. 5).

#### i. Webster's first opinion.

In reaching his first opinion, Webster observed the jack screw was worn down to 0.224 inch diameter from an original 0.480 inch diameter. (Docket #61, Ex. 5).

Webster calculated this wear reduced the bending strength of that jack screw to 9% of its original strength. (Docket #61, Ex. 5). Webster developed a 3-D model of the lift using a "combination of physical measurements, drawings from the defendant, photographs, and x-rays images of the inside of the failed outrigger jack screw and foot." (Docket #61, Ex. 2). Using this computerized model, Webster "was able to move the [outrigger] parts relative to each other and determine how the change in geometry of the components changed the contact points between the parts, resulting in bending forces that would not have occurred with the components in new, non-worn components." *Id*.

JLG argues Webster's expert opinion is not reliable because it has not been tested. (Docket #51). JLG compares this case to several Sixth Circuit cases in which an expert's opinion was deemed unreliable for failure to conduct laboratory tests or recreate accidents. *See e.g. Manitowoc Boom Trucks,* 484 F.3d at 430-31; *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000). JLG stresses that JLG's own expert witness – Michael Boggess – attempted to physically recreate the accident under various circumstances. (Docket #51).

Plaintiff responds by citing cases which hold "testing is not required in every case, particularly where, as here, the expert conducted an examination of the physical evidence." *Jacobs v. Tricam Indus.*, 816 F. Supp. 2d 487, 493 (E.D. Mich, 2011). *Clark v. Chrysler Corp.*, 310 F.3d 461, 467 (6th Cir. 2002) ("*Daubert* does not require an expert to come in and actually perform tests in any given situation"). Moreover, while Webster did not conduct physical tests, he did construct a 3-D model and used this to recreate the conditions under which the jack screw failed. (Docket #61). Webster also

criticized Boggess's physical tests as "faulty" and not representative of the actual conditions at the time and claimed his computer model "provided much more pertinent information." (Docket #61, Ex. 2, 5).

The Court agrees that physical testing is not required, especially as Webster physically observed the evidence and has tested his theories through computer simulations. JLG may raise Webster's failure to physically test in regards to the "weight of his testimony," but Plaintiff has satisfactorily shown it is admissible. *Clay v. Ford Motor Co.*, 215 F.3d 663, 668 (6th Cir. 2000).

### ii. Webster's second opinion.

Webster's second opinion is that a viable alternative design would have avoided the wear. Specifically, Webster opines that design of the jack screw caused "metal-to-metal friction," and "[s]ound engineering principles do not support using metal-to-metal friction." (Docket #61, Ex. 5). Instead, Webster proposes a "ball and socket" connection that "eliminates the wear problem" and was "very commonly used in other applications for attaching a stationary foot to a rotating screw at the time the jack screw was designed." (Docket #61, Ex. 2). Webster admits he did not test this alternative design, but claims in his experience this solution is "so obvious as to not require formal calculations to come to a conclusion." (Docket #61, Ex. 2). JLG did subsequently adopt a ball and socket design, but claims there "was no engineering or safety-related basis for the change; it was based solely on outsourcing." (Docket #51).

JLG argues Webster's proposed alternative is unreliable because Webster did not test it. (Docket #51). Plaintiff responds that Webster's alternative design was

commercially available and in use at the time and that Webster relied on his knowledge and experience in proposing this design. (Docket #61).

"One way to overcome the testing requirement might be to show that the expert has significant technical expertise in the specific area in which he is suggesting an alternative design." *Manitowoc Boom Trucks,* 484 F.3d at 432. Webster's education and twenty-nine years of experience designing and testing vertical lifts demonstrates significant technical experience. While the Court agrees that testing alternative designs is always desirable, testing is not a prerequisite to admissibility. Testing is generally needed in cases where the alternative design is either complex in itself or its interaction with other components would be difficult to predict absent testing.[1] *Manitowoc Boom Trucks, Inc.*, 484 F.3d at 432 (excluding expert testimony on a "interlocking outrigger proposal" because no testing was done to see if "such alteration would negatively have affected the truck's safety or performance."); *Brown v. Raymond Corp.*, 432 F.3d 640, 648 (6th Cir. 2005) ("the design of industrial equipment is a complex process and changes to prevent one problem could create other problems") (citation omitted). The need for testing is blunted if the proposed alternative design is simple or is already used in the industry. *Clark*, 310 F.3d at 479 ("Mr. Gilberg testified that several simple fixes would have prevented bypass failure . . . . Many of the alternative latch systems

---

[1] The Seventh Circuit listed several competing factors which must be considered when proposing an alternative design for a complex system, such as a piece of heavy machinery:

> These include, but are not limited to, the degree to which the alternative design is compatible with existing systems and circuits; the relative efficiency of the two designs; the short- and long-term maintenance costs associated with the alternative design; the ability of the purchaser to service and to maintain the alternative design; the relative cost of installing the two designs; and the effect, if any, that the alternative design would have on the price of the machine. Many of these considerations are product- and manufacturer-specific, and most cannot be determined reliably without testing. Cummins v. Lyle Indus., 93 F.3d 362, 369 (7th Cir. 1996).

proposed by Mr. Gilberg had actually been in use by vehicle manufacturers for many years prior"); *Millea v. Ford Motor Co.*, 2014 U.S. Dist. LEXIS 103604 *12 (W.D. Ky. 2014); *see also Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 76 (S.D.N.Y. 2001) (collecting cases) ("Adherence to engineering standards of intellectual rigor almost always requires testing of a hypothesis if the expert cannot point to an existing design in the marketplace."); *Isatou Bah v. Nordson Corp.*, 2005 U.S. Dist. LEXIS 15683 *25-26 (S.D.N.Y. 2005) ("the interlock switch and nozzle diffuser proffered by Dr. Storace do exist in the marketplace in products similar to the subject machine that he helped design, and thus testing is not needed to establish their feasibility").

### B.  John Jendrzejewski expert opinion is reliable.

Jendrzejewski offers two opinions:  (i) the jack screw was worn from contact with a hardened steel washer during periods when the screw was being turned to raise or lower the outrigger leg; and (ii) the fractured surface of the jackscrew showed three to four bands of "microscopic dull features" which mean the jack screw bent three to four times before fracturing.  (Docket #61, Ex. 7, 8).

#### i.  Jendrzejewski's first opinion.

Jendrzejewski's first opinion is that the jack screw was worn down due to contact with the hardened steel washer.  Jendrzejewski admits that he does "not know the exact properties" of the jack screw and the steel washer.  (Docket #61, Ex. 7). Instead, he relies on the "scientific metallurgical fact, that with contact of two metal components, the softer component will wear before the harder component does." *Id.*

JLG criticizes Jendrzejewski for not calculating the strength of the jack screw and the steel washer and for instead concluding the steel must have been harder "based

on prior observations (of other devices)" and the fact that the jack screw, not the steel washer, was worn down. (Docket #51). However, JLG does not dispute the general scientific premise that when a harder metal and softer metal are in contact, the softer metal will wear first. In fact, JLG's own metallurgy expert concedes the jack screw is comprised of a softer metal and was worn down by contact with the washer on the foot pad. (Docket #51, Ex. 9) ("it indicates the washer is harder . . . there can be some contact between the jackscrew and the foot pad, and the rotation and the contact results in wear of the foot pad and the jackscrew").

An expert is not precluded from making deductive conclusions based on physical observations. *See e.g. Sowards v. Grange Mut. Cas. Ins. Co.*, 2008 U.S. Dist. LEXIS 118328 *12-13 (M.D. Tenn. 2008). "Furthermore, testing is not required in every case, particularly where, as here, the expert conducted an examination of the physical evidence." *Jacobs v. Tricam Indus.*, 816 F. Supp. 2d 487, 493 (E.D. Mich. 2011) ("visual inspection of the wear marks on the ladder and ladder stabilizer led to his opinion that the failure was the result of the shearing of the rivets due to wear and tear. This opinion is based on an inspection of the physical evidence; it is not an opinion that requires testing of a methodology or process."). The Plaintiff has shown that Jendrzejewski's first opinion is reliable for the purpose of admissibility.

### ii.     Jendrzejewski's second opinion.

Jendrzejewski's second opinion is that the fractured surface of the jackscrew showed three to four bands of "microscopic dull features" which signify the jack screw bent three to four times before fracturing. (Docket #61, Ex. 7, 8).

JLG argues Jendrzejewski could have tested his conclusions by setting up an "exemplar worn down jackscrew and attempt[ing] to replicate the forces." (Docket #51, Ex. 1). [2] The Court agrees that such a comparison could be useful. However, Jendrzejewski's method for reaching his conclusion still appears to be sound. Jendrzejewski used a microscope to observe the surface of the fracture of drew conclusions from what he observed. (Docket #61, Ex. 7, 8). JLG's own expert performed a similar analysis, though he also compared exemplar broken jack screws to the jack screw from the Lift. (Docket #51, Ex.9) ("Just looked at the fracture surface under a microscope, compared those to photographs of the subject under the microscope, compared them to my photograph of the subject."). Plaintiff has satisfactorily shown that the testimony of Jendrzejewski is admissible.

## CONCLUSION

IT IS HEREBY ORDERED that for the foregoing reasons, Defendant's JLG Industries, Inc.'s Motion to Exclude Expert Testimony of John Jendrzejewski and Mark Webster (Docket #51) is DENIED.

cc: Counsel

---

[2] JLG's other arguments are unpersuasive. JLG claims Jendrzejewski did "not even know the number of cycles that caused the fracture." (Docket #51). Jendrzejewski states that it was three or four cycles, but stresses the "precise number" is not significant, but rather that "multiple bending cycles" occurred. (Docket #61, Ex. 7). JLG also stresses that its own expert disagrees with Jendrzejewski, but this indicates nothing more than the fact that the parties have competing theories on how the accident occurred.